1

2

3

4

5                     UNITED STATES DISTRICT COURT

6                     NORTHERN DISTRICT OF CALIFORNIA

7

8   JOHN SENDER,                              No. C-11-3828 EMC

9           Plaintiff,

10          v.                               **ORDER GRANTING DEFENDANT'S**
                                             **MOTION FOR JUDGMENT ON THE**
11  FRANKLIN RESOURCES, INC.,                **PLEADINGS AND MOTION FOR**
                                             **SUMMARY JUDGMENT; AND**
12          Defendant.                       **DENYING PLAINTIFF'S MOTION TO**
                                             **REMAND**
13  _____/     **(Docket Nos. 74, 77, 113)**

14

15

16          Plaintiff John B. Sender has filed suit against Defendant Franklin Resources, Inc.  Under the

17  current operative complaint (*i.e.*, the second amended complaint or "SAC"), the only claim being

18  asserted is an ERISA claim, more specifically a claim for benefits pursuant to the terms of an

19  employee stock ownership plan ("ESOP" or "Plan").  *See* 29 U.S.C. § 1132(a)(1)(B).  Currently

20  pending before the Court are three motions: (1) Mr. Sender's motion to remand, (2) Franklin's

21  motion for judgment on the pleadings, and (3) Franklin's motion for summary judgment.  Having

22  considered the parties' briefs and accompanying submissions, as well as the oral argument of

23  counsel, the Court hereby **DENIES** the motion to remand, **GRANTS** the motion for judgment on the

24  pleadings, and **GRANTS** the motion for summary judgment.

25  ///

26  ///

27  ///

28  ///

*United States District Court*
For the Northern District of California

United States District Court
For the Northern District of California

# I.   **MOTION TO REMAND**

A.   Factual & Procedural Background

Mr. Sender initiated this lawsuit against Franklin in state court.  In the first amended complaint ("FAC") – filed while the case was still in state court – Mr. Sender alleged that he was previously an employee of Franklin; that, during his time with Franklin, he acquired shares in a now-discontinued ESOP; but that ultimately those shares were never delivered to him.  *See* FAC ¶ 1. Mr. Sender also alleges that he was not aware that he was entitled to any shares as retirement benefits until 2007, when he received a letter from the Social Security Administration.  *See* FAC ¶ 14.  By that time, the Plan had not been in existence for more than twenty years.  *See* FAC ¶ 12.

On the face of the amended complaint, Mr. Sender asserted only state law claims: (1) breach of fiduciary duty, (2) negligence, and (3) an order directing issuance and delivery of a share certificate pursuant to the California Corporation Code.[1]  Franklin nevertheless removed, arguing that the state law claims were preempted by ERISA and therefore removable.  In an order filed on October 20, 2011, the Court agreed with Franklin and thus denied Mr. Sender's motion to remand the case back to state court and further granted Franklin's motion to dismiss.  *See* Docket No. 25 (order).  The Court gave Mr. Sender an opportunity to file an amended complaint, which he did.  In the SAC, Mr. Sender asserted a single ERISA claim, namely, a claim for benefits pursuant to 29 U.S.C. § 1132(a)(1)(B) (providing that "[a] civil action may be brought . . . by a participant or beneficiary . . . to recover benefits due to him under the terms of his plan [or] to enforce his rights under the terms of the plan").  Mr. Sender did not bring any other ERISA claim, such as one for breach of fiduciary duty.

Now, more than a year later, Mr. Sender has filed a second motion to remand, asserting that the Court lacks subject matter jurisdiction over this case because, under Supreme Court precedent, *see Beck v. PACE Int'l Union*, 551 U.S. 96 (2007), "once a retirement plan has been terminated[,]

---

[1] *See* Cal. Corp. Code § 419(b) (providing that, "[i]f a corporation refuses to issue a new share certificate or other certificate in place of one theretofore issued by it, or by any corporation of which it is the lawful successor, alleged to have been lost, stolen or destroyed, the owner of the lost, stolen or destroyed certificate or the owner's legal representative may bring an action in the superior court of the proper county for an order requiring the corporation to issue a new certificate in place of the one lost, stolen or destroyed").

United States District Court

For the Northern District of California

1    ERISA no longer applies to a dispute regarding whether beneficiaries received proper payment

2    therefrom [and] [s]tate court remedies alone apply."  Mot. at 1.

3    B.    Legal Standard

4              A defendant may remove an action to federal court based on federal
         question jurisdiction or diversity jurisdiction.  However, "'[i]t is to be
5         presumed that a cause lies outside [the] limited jurisdiction [of the
         federal courts] and the burden of establishing the contrary rests upon
6         the party asserting jurisdiction.'"  The "strong presumption against
         removal jurisdiction means that the defendant always has the burden
7         of establishing that removal is proper," and that the court resolves all
         ambiguity in favor of remand to state court.

8

9    *Hunter v. Philip Morris USA*, 582 F.3d 1039, 1042 (9th Cir. 2009).

10            In the instant case, Franklin removed based on federal question jurisdiction – *i.e.*, because

11   the state law claims were completely preempted by ERISA.  Mr. Sender now argues that, under the

12   Supreme Court's decision in *Beck*, once the Plan at issue terminated, he was barred from bringing

13   any ERISA claim and therefore was correct at the outset in asserting only state law claims.

14   C.    *Beck*

15            Because Mr. Sender's motion is predicated entirely on *Beck*, a brief discussion of the case is

16   warranted.

17            In *Beck*, the employer, Crown, had defined-benefit pension plans for its employees, who

18   were part of a union.  In 2000, Crown filed for bankruptcy and proceeded to liquidate its assets.  *See*

19   *Beck*, 551 U.S. at 98-99.  Under ERISA, Crown was allowed to terminate the pension plans

20   voluntarily, and one of the possibilities that Crown considered was a "standard" termination under

21   ERISA which would involve the purchase of annuities.  *See id.* at 99.  The union, however,

22   suggested that Crown instead merge the pension plans covering the union members with a different

23   plan – more specifically, a multiemployer plan.  In other words, Crown would convey all plan assets

24   to the multiemployer plan, and the multiemployer plan would assume all plan liabilities.  *See id.*

25            Crown decided against the union's proposal, largely because it learned that it had overfunded

26   certain of the pension plans.  This meant that, if Crown terminated the pension plans by purchasing

27   annuities, it would "retain a projected $5 million reversion for its bankruptcy creditors after

28   satisfying its obligations to plan participants and beneficiaries."  *Id.*  In contrast, if Crown were to

3

**United States District Court**
For the Northern District of California

1   adopt the union's proposal (*i.e.*, merger), then the $5 million would go to the multiemployer plan.

2   *See id.*  Furthermore, "the Pension Benefit Guaranty Corporation (PBGC), which administers an

3   insurance program to protect plan benefits, agreed to withdraw the proofs of claim it had filed

4   against Crown in the bankruptcy proceedings if Crown went ahead with an annuity purchase." *Id.* at

5   99-100.  Crown thus consolidated the pension plans into a single plan and terminated that plan

6   through the purchase of a $84 million annuity which fully satisfied its obligations to plan

7   participants and beneficiaries and also allowed it to "reap the $5 million reversion in surplus funds."

8   *Id.* at 100.

9        The union and two plan participants filed an adversary action against Crown in the

10  bankruptcy court, asserting that "Crown's directors had breached their fiduciary duties under ERISA

11  by neglecting to give diligent consideration to [the union's] merger proposal." *Id.*  The issue

12  presented to the Supreme Court was "whether an employer that sponsors and administers a single-

13  employer defined-benefit pension plan has a fiduciary obligation under [ERISA] to consider a

14  merger with a multiemployer plan as a method of terminating the plan." *Id.* at 98.

15       The Supreme Court held in favor of Crown because, as a matter of law, a merger was not a

16  permissible form of plan termination under ERISA; rather, a merger was an alternative to plan

17  termination.  *See id.* at 106 (noting that a merger "represents a *continuation* rather than a *cessation*

18  of the ERISA regime") (emphasis in original).

19       None of the above has any relevance to the case at bar.  However, in reaching the above

20  holding, the Supreme Court made note that termination and merger were different in that

21  > terminating a plan through purchase of annuities (like terminating
22  > through distribution of lump-sum payments) formally severs the
23  > applicability of ERISA to plan assets and employer obligations.  Upon
     > purchasing annuities, the employer is no longer subject to ERISA's
     > multitudinous requirements, such as (to name just one) payment of
     > insurance premiums to the PBGC . . . . And the PBGC is likewise no
24  > longer liable for the deficiency in the event that the plan becomes
     > insolvent; there are no more benefits for it to guarantee. *The assets of
25  > the plan are wholly removed from the ERISA system, and plan
     > participants and beneficiaries must rely primarily (if not exclusively)
26  > on state-contract remedies if they do not receive proper payments or
     > are otherwise denied access to their funds.*  Further, from the
27  > standpoint of the participants and beneficiaries, the risk associated
     > with an annuity relates solely to the solvency of an insurance
28  > company, and not the performance of the merged plan's investments.

**United States District Court**
For the Northern District of California

*Id.* (emphasis omitted and added).

Mr. Sender relies on the italicized language above to support his claim that, "once an ERISA qualified retirement plan has been terminated, . . . ERISA no longer applies to disputes that arise thereunder for benefits and state court remedies alone apply." Mot. at 2.  Mr. Sender overreads this dictum.  The only point that the Supreme Court was making in *Beck* was that, where an employer terminates a plan *through a purchase of an annuity*, and the entity in charge of the annuity fails to make a payment to a plan participant or beneficiary, the plan participant or beneficiary does not have an ERISA claim but rather must seek relief under state contract law (an annuity being in the end a contract).  *See, e.g.*, *Hallingby v. Hallingby*, 574 F.3d 51, 55 (2d Cir. 2009) (stating that, "[w]hen an employer terminates an employee benefit plan and provides for the payment of benefits by purchasing annuities in accordance with [ERISA], the annuities and the benefits they provide are no longer covered by ERISA"; citing *Beck* in support).  The language in *Beck* was focused on the specific circumstance of termination through purchase of an annuity, a means of termination provided for by statute.  *See Beck*, 551 U.S. at 99 (citing 29 U.S.C. § 1341(b)(3)(A)(i)).  Notably, in quoting from *Beck*, Mr. Sender leaves out the critical language about termination of a plan being effected *through the purchase of an annuity*.  *See* Mot. at 2 (quoting *Beck* as follows: "'[T]erminating a plan . . . formally severs the applicability of ERISA to plan assets and employer obligations'"; the ellipsis leaves out the critical language "through purchase of annuities").

In the case at bar, there is nothing to suggest the Plan was terminated through a purchase of annuities.  Indeed, Mr. Sender appears to concede it was not.  *See* Reply at 3 (noting that there was not a purchase of an annuity upon plan termination but rather a lump sum payment of benefits).  But Mr. Sender argues that *Beck* can be read more broadly – *i.e.*, to stay that, where there is a termination of a plan, *by whatever means*, then ERISA has no more applicability and only state law governs.  To be sure, Mr. Sender is not without some support for this position.  As he points out, the Supreme Court stated that "terminating a plan through purchase of annuities (*like terminating through distribution of lump-sum payments*) formally severs the applicability of ERISA to plan assets and employer obligations." *Beck*, 551 U.S. at 106 (emphasis added).

United States District Court

For the Northern District of California

1   Nevertheless, the Court does not agree with Mr. Sender's contention that *any* claim that

2   comes after plan termination can be based only on state law and not ERISA.  *Cf. Wilmington*

3   *Shipping Co. v. New Eng. Life Ins. Co.*, 496 F.3d 326, 338 (4th Cir. 2007) (stating that "there is no

4   provision in the [ERISA] statutory scheme that expressly revokes participants' standing upon

5   termination of the plan").  Whether ERISA or state law controls is largely dependent on when the

6   alleged *misconduct* at issue took place, *i.e.*, during the existence of the plan or thereafter.  If the

7   alleged misconduct took place during the existence of the plan, then, as a general matter, ERISA

8   should control, even if suit is brought after termination.  *See, e.g.*, *General Produce Distribs. v.*

9   *Professional Benefit Trust Mult. Employer Welfare Benefit Plan & Trust*, No. 08 C 5681, 2009 U.S.

10  Dist. LEXIS 69194, at *14-15 (N.D. Ill. Aug. 7, 2009) (stating that "*Beck* in no way suggests that

11  plan administrators who breach fiduciary duties *during the life of a plan* are somehow immunized

12  from liability once the plan terminates[;] [i]ndeed, such a conclusion would be contrary to ERISA's

13  remedial objectives").  If it is not based on such conduct, state law may control in many, if not most,

14  situations.  *See Beck*, 551 U.S. at 106 (stating that, after a plan terminates through a purchase of an

15  annuity, "plan participants and beneficiaries must rely primarily (if not exclusively) on state-contract

16  remedies if they do not receive proper payments or are otherwise denied access to their funds").

17  Nonetheless, there are instances in which ERISA still controls even where misconduct takes place

18  after plan termination.  *See, e.g.*, *Horn v. Berdon, Inc. Defined Ben. Pension Plan*, 938 F.2d 125 (9th

19  Cir. 1991) (applying ERISA to a claim for breach of fiduciary duty where, after plan terminated,

20  employer found that there was a surplus – *i.e.*, plan assets exceeded liabilities – and distributed

21  surplus to corporation rather than beneficiaries); *see also Vaughn v. Bay Environmental*

22  *Management, Inc.*, 567 F.3d 1021, 1027 (9th Cir. 2009) (indicating that, even after plan termination,

23  a plan could be "'viewed as continuing to exist for the purpose of distributing the equitably vested

24  benefits'"); *cf. Gallagher v. Life Ins. Co. of N. Am.*, No. C 07-05224 SBA, 2008 U.S. Dist. LEXIS

25  119693, at *36-37 (N.D. Cal. Mar. 19, 2008) (stating that plaintiff had a claim for benefits under 29

26  U.S.C. § 1132(a)(1)(B) even though "the Plan no longer exists [as of January 1, 1996]" because "the

27  Plan *benefits* have flowed to [plaintiff] continuously, since December 5, 1989, through their

28  termination on June 6, 2006") (emphasis in original).

Notably, several of the cases cited by Franklin fall in line with the general principle that the timing of the misconduct at issue dictates whether or not ERISA applies.  In *Vaughn*, for example, the plaintiffs claimed that the employer and plan trustees had breached their fiduciary duties because, during the existence of the plans at issue, they had invested the plans' assets imprudently. *See Vaughn*, 567 F.3d at 1024.  In *Peralta v. Hispanic Business, Inc.*, 419 F.3d 1064 (9th Cir. 2005), the charge was a breach of fiduciary duty on the ground that the employer did not provide notice of termination of a long term disability plan.  *See id.* at 1067-68.

Because the timing of the alleged misconduct informs whether or not ERISA is applicable, the Court evaluates Mr. Sender's complaint as it stood at the time of removal to determine what the alleged misconduct at issue was.  A copy of that complaint – the first amended complaint ("FAC") – is attached to the notice of removal.  *See* Docket No. 1 (FAC).

In the FAC, Mr. Sender pleaded the following state law causes of action: (1) a claim for breach of fiduciary duty; (2) a claim for negligence; and (3) a claim requesting an order directing the issuance and delivery of a share certificate pursuant to California Corporations Code § 419(b). Implicitly, the fiduciary duty claim is predicated on misconduct during the existence of the Plan.  *Cf. Waller v. Blue Cross*, 32 F.3d 1337, 1339 (9th Cir. 1994) ("agree[ing] with defendants that participants and beneficiaries of a terminated plan have no standing to seek legal damages for breach of fiduciary duty once the Plan was terminated and Plan liabilities were satisfied"; adding that plaintiffs had "standing to pursue the equitable remedy of a constructive trust to distribute defendants' allegedly ill-gotten profits to the former participants and beneficiaries").  For that claim, Mr. Sender alleges as follows:

> 23.    Franklin served as a fiduciary with regard to [Mr.] Sender's interest in the ESOP.  In this capacity, Franklin was obligated to protect and safeguard [Mr.] Sender's interests and ensure that he received all benefits to which he was entitled.
>
> 24.    Franklin failed to fulfill its fiduciary obligations owed to [Mr.] Sender by, *inter alia*, failing to ensure that [Mr.] Sender actually received the stock certificates reflecting his interest in the ESOP and failing to adequately maintain records related to the ESOP.

///

///

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

1  Docket No. 1 (FAC ¶¶ 23-24).  Likewise, the negligence claim is predicated on misconduct during

2  the existence of the Plan.  *See* Docket No. 1 (FAC ¶ 28) (alleging that "Franklin had a duty to use

3  such skill, prudence, and diligence that other fiduciaries of ESOPs commonly possess and exercise"

4  and that "Franklin breached that duty by engaging in the actions, and failures to take action, alleged

5  above").  Importantly, both the fiduciary duty and negligence claims are rooted in duties owed under

6  ERISA, further strengthening this Court's conclusion that federal ERISA jurisdiction obtains.

7       While the § 419(b) claim seems to be predicated on alleged misconduct that took place post-

8  Plan termination, *see* Docket No. 1 (FAC ¶ 36) (alleging that Franklin refused [in 2008], and

9  continues to refuse, to issue [Mr.] Sender a new share certificate in place of the original

10  certificates"), that is immaterial because the fiduciary duty and negligence claims are governed by

11  ERISA, which is sufficient to give rise to federal question jurisdiction.  Any remaining claim would

12  be covered by supplemental jurisdiction.

13       Of course, when Mr. Sender ultimately repled his claims, he did not choose to make any

14  claim of breach of fiduciary duty under ERISA, *see* 32 U.S.C. § 1132(a)(2), and instead simply

15  brought a claim for benefits.  *See id.* § 1132(a)(1)(B).  Nevertheless, the fact remains that Mr.

16  Sender's complaint *at the time of removal* was based on a fiduciary duty theory, and that alleged

17  misconduct was during the existence of the Plan.

18       Accordingly, the Court concludes that Franklin's removal of the case was proper because, at

19  the very least, Mr. Sender's fiduciary duty and negligence claims, as pled in the FAC, were

20  preempted by ERISA.  Mr. Sender's motion to remand is therefore denied, and the Court now turns

21  to the two motions filed by Franklin.

22                    **II.    MOTION FOR JUDGMENT ON THE PLEADINGS**

23  A.    Factual & Procedural Background

24       As noted above, in the current operative complaint, *i.e.*, the SAC, Mr. Sender has asserted a

25  single ERISA claim, namely, a claim for benefits pursuant to § 1132(a)(1)(B).  After Franklin

26  answered the SAC, the parties began to have disputes about the discovery that Mr. Sender could take

27  in the ERISA case, which then gave rise to the question of whether Franklin was a proper defendant

28  in the case.  At a hearing on one of the discovery disputes, the Court instructed Mr. Sender to file an

United States District Court

For the Northern District of California

1    amended complaint (Mr. Sender had asked at the hearing for leave to file an amended complaint),

2    after which Franklin would then file a motion to dismiss under Federal Rule of Civil Procedure

3    12(b)(6) and a motion for summary judgment.  *See* Docket No. 70 (civil minutes).  Ultimately, Mr.

4    Sender declined to file a third amended complaint, choosing instead to "stand" on the SAC as pled.

5    Docket No. 72 (statement).  Franklin accordingly filed the currently pending motion for judgment on

6    the pleadings (as well as the motion for summary judgment).[2]

7         In his SAC, Mr. Sender alleges as follows.  Mr. Sender was an employee of Franklin during

8    two periods of time: (1) from June 1972 to January 1978 and (2) from 1983 to 1989.  *See* SAC ¶ 10.

9    The Plan at issue – an ESOP – was established in 1975 and terminated in 1981.[3]  *See* SAC ¶¶ 11-12.

10   At the time that Mr. Sender left employment with Franklin in 1978, the Plan still existed, but it did

11   not allow for immediate distributions to participants younger than 55 years old; accordingly, the

12   benefits that Mr. Sender had accrued from 1975 to 1978 remained in the Plan.  *See* SAC ¶ 11.  When

13   Franklin subsequently terminated the Plan, the Plan assets were distributed to participants.  *See* SAC

14   ¶ 12.  Although Mr. Sender should have received distributions, he did not.  According to Mr.

15   Sender, "Franklin has no records demonstrating that the transfer of stock or cash was *actually* made

16   to, and received by, [him]."  SAC ¶ 12 (emphasis in original).

17        In 2007, Mr. Sender received a letter from the Social Security Administration, which advised

18   him that he "may be entitled to pension benefits from Franklin upon retirement."  SAC ¶ 14.  Mr.

19   Sender contacted Franklin to pursue the issue.  In April 2008, Mr. Sender was "informed that the

20   Franklin Resources, Inc. Administrative Committee had denied [his] claim.  The Committee stated

21   that the 'ESOP records maintained by Franklin clearly indicate that [he] previously received a full

22

23        [2] In his papers, Mr. Sender suggests that Franklin's motion should be rejected because it does
     not comport with the Court's procedural order which allowed Franklin to file a motion to dismiss
24   once Mr. Sender amended his complaint.  *See* Opp'n at 2 n.1.  This argument is rejected.  Mr.
     Sender chose not to file an amended complaint; thus, it was fair for Franklin to file the equivalent of
25   a motion to dismiss (*i.e.*, a motion for judgment on the pleadings) with respect to the complaint that
     Mr. Sender chose to "stand" on.  Docket No. 72 (statement).  Franklin's motion for judgment on the
26   pleadings covers the very territory that was discussed during the prior discovery hearings – *i.e.*,
     whether Franklin is a proper defendant in the action.

27        [3] There does not appear to be any dispute that the Plan was actually terminated in 1983, but
28   termination was retroactively effective as of 1981.  *See* Smith Decl., Exs. M-N (memo from Franklin
     to employees, dated 1983, and 1983 tax form).

9

United States District Court

For the Northern District of California

1  distribution of [his] benefits from the ESOP.'"  SAC ¶ 16.  Mr. Sender disputes this, claiming that

2  there is no evidence that "the stock was ever received or later sold by [him]."  SAC ¶ 17.

3        Mr. Sender appealed the Administrative Committee's decision.  In his May 2008 appeal

4  letter, Mr. Sender did not "'dispute that the Company created a Certificate reflecting his share

5  balance nor that his name[] appeared on the Company's List of Registered Shareholders.'"  SAC ¶

6  18.  Mr. Sender asked, however:  "'What evidence, if any, shows that [he] ever received the Stock

7  Certificate reflecting his ESOP shares – what evidence is there that it was delivered.'"  SAC ¶ 18.

8        Mr. Sender's appeal was unsuccessful, and so he initiated the instant lawsuit against Franklin

9  in May 2011.  *See* Docket No. 1 (complaint).  As noted above, the case was initiated in state court

10  but was removed to federal court in August 2011.  *See* Docket No. 1 (notice of removal).  This Court

11  held that Mr. Sender's claims were preempted by ERISA, thereby conferring federal jurisdiction,

12  and Mr. Sender eventually filed a SAC which asserted a single claim for relief – *i.e.*, a claim for

13  benefits pursuant to § 1132(a)(1)(B).

14        Significantly, the SAC does not claim that Franklin, as employer, failed to fund the Plan.

15  Rather, the claim is that the Plan failed to distribute the benefits owed under the Plan.  In July 2012,

16  during a hearing on one of Mr. Sender's discovery motions, the following colloquy took place

17  between the Court and Mr. Sender's counsel, which confirmed the scope of Mr. Sender's claim.

18       Court:          . . . . [Y]ou're not alleging that there's a failure of
                           Franklin to put the stock into the Plan.  It was the
19                         failure of the Plan to then distribute the stock to Mr.
                           Sender.
20
         Counsel:        *Technically that would be correct, your Honor.*  But
21                         frankly, I think this sort of all amounts to somewhat of
                           a shell game in terms of these entities. . . .
22

23  Docket No. 75 (Perkins Decl., Ex. B) (Tr. at 6) (emphasis added).

24  B.    Legal Standard

25        Under Federal Rule of Civil Procedure 12(c), "a party may move for judgment on the

26  pleadings" after the pleadings are closed "but early enough not to delay trial."  Fed. R. Civ. P. 12(c).

27  A Rule 12(c) motion is "'functionally identical'" to a Rule 12(b)(6) motion to dismiss for failure to

28  state a claim, and therefore the same legal standard applies.  *Cafasso v. General Dynamics C4 Sys.,*

10

*Inc.*, 637 F.3d 1047, 1055 n.4 (9th Cir. 2011).  That is, a court considers "whether the complaint's factual allegations, together with all reasonable inferences, state a plausible claim for relief."  *Id.* at 1054; see also *Johnson v. Rowley*, 569 F.3d 40, 44 (2d Cir. 2009) (stating that, "[t]o survive a Rule 12(c) motion, the complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face" (internal quotation marks omitted).

C.   <u>Franklin's Motion to Strike (Docket No. 96)</u>

Because a motion for judgment on the pleadings asks a court to make a determination based on the pleadings alone, evidence outside the pleadings is, as a general matter, not appropriate unless, *e.g.*, the evidence may be judicially noticed.  *See Pavlina v. Safeco Ins. Co. of Am.*, No. 12-CV-534-LHK, 2012 U.S. Dist. LEXIS 159991, at *8 (N.D. Cal. Nov. 6, 2012); *North Am. Capacity Ins. Co. v. Navigators Specialty Ins. Co.*, No. C 12-01488 RS, 2012 U.S. Dist. LEXIS 144077, at *3 (N.D. Cal. Oct. 4, 2012).

In the instant case, both parties have submitted evidence outside the pleadings.  Franklin has filed a motion to strike in which it contests some of the evidence submitted by Mr. Sender as evidence that may not be judicially noticed.  More specifically, Franklin seeks to strike the following documents:

(1)   Exhibits A, E, and F attached to the Kessler declaration, *see* Docket No. 92 (Kessler Decl.);

(2)   the Sender declaration, *see* Docket No. 90 (Sender Decl.); and

(3)   all exhibits attached to the Smith declaration.  *See* Docket No. 79 (Smith Decl.).

The motion to strike the Sender declaration and the exhibits attached to the Smith declaration are denied as moot.  Those declarations appear to have been offered in conjunction with the motion for summary judgment only, and not the motion for judgment on the pleadings.

As for the Kessler declaration, the exhibits at issue are as follows.

///

///

///

///

///

1.   <u>Exhibit A</u>

Exhibit A is an e-mail dated September 4, 2007.[4]  Its author is Nicole Smith, who appears to have worked in Franklin's human resources department at the time.  The recipient of the e-mail is Maria Gray.

Ms. Smith sent the e-mail to Mr. Gray to "pick[] [her] brain about what trail there could be from a transfer agent or such in tracking down this stock [*i.e.*, the stock that Mr. Sender claims was not distributed to him]. . . . I was hoping that someone with knowledge about stock transactions and transfers and registration could help me figure out where else to look and what questions to ask since we have not had any luck finding the plan files so far."  Kessler Decl., Ex. A (e-mail).  In the e-mail, Ms. Smith noted: "I am obviously concerned about our liability on this" because "they are now estimating that the value of the stock in question would now be worth between $32 million and $50 million."  Kessler Decl., Ex. A (e-mail).

Franklin is correct that this e-mail may not be judicially noticed.  First, the e-mail may not be judicially noticed under Federal Rule of Evidence 201.  *See* Fed. R. Evid. 201(b) (providing that a "court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned").  Second, the e-mail may not be judicially noticed pursuant to the Ninth Circuit's incorporation-by-reference doctrine because Mr. Sender did not necessarily rely upon the e-mail in his complaint or allege the contents of the e-mail in his complaint.  *See Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010) (noting that "[w]e have extended the doctrine of incorporation by reference to consider documents in situations where the complaint necessarily relies upon a document or the contents of the documents are alleged in a complaint, the document's authenticity is not in question and there are no disputed issues as to the document's relevance").  Third, to the extent Mr. Sender argues that the Court may take judicial notice of the e-mail because it is a part of the administrative record, he has cited only district court case (outside the Ninth Circuit) to show the administrative record *in an*

---

[4] As noted above, Mr. Sender claims that he received a notice from the SSA in 2007, which prompted him to contact Franklin about benefits that he was allegedly owed.

United States District Court
For the Northern District of California

*ERISA case* – compiled by a private entity rather than a government body – may be judicially

noticed in the context of a Rule 12 motion to dismiss.  *See Brown v. Walgreens Income Prot. Plan*

*for Store Mgrs.*, No. 10-14442, 2012 WL 1060093, at *2 (E.D. Mich. Mar. 29, 2012).  That case is

not binding authority on this Court and, in any event, is not persuasive.

      While the Court thus declines to take judicial notice of the e-mail, the Court may still have to

take the evidence into consideration at some point – more specifically, if the Court were to grant

Franklin's motion for judgment on the pleadings.  This is because, if the Court were to grant

Franklin's motion, then it would have to consider whether Mr. Sender should be allowed to amend.

*See Corner v. Paragon Sys.*, No. C-12-41752 EMC, 2012 U.S. Dist. LEXIS 151741, at *5-6 (N.D.

Cal. Oct. 22, 2012) (noting that, although Rule 12(c) does not mention leave to amend, courts

generally have discretion to grant a Rule 12(c) motion with leave to amend).  Exhibit A may be

considered in that context.

      2.   <u>Exhibit F</u>

      Exhibit F is an e-mail, dated March 3, 2008.  Its author is Brad Huss, who was Franklin's

outside counsel at the time and who is currently one of the attorneys of record representing Franklin

in this lawsuit.  The recipient of the e-mail is Ms. Smith, who as noted above appears to have

worked in Franklin's human resources department at the time.

      In the e-mail, Mr. Huss states in relevant part as follows:

> I believe that the *current* plan Administrative Committee is the best entity to consider and rule on Sender's claim for benefits and any appeal that he may file if the claim is denied.  The SPD [Summary Plan Description] for the old ESOP says that the Plan Administrator is the Plan Administrative Committee and that the Administrative Committee will process benefit claims when there has been a termination of employment.  The SPD also says that any appeal is to be presented to the Administrative Committee.  The current Administrative Committee acts for the profit sharing/401(k) plan and the effective date of that Plan is 10/01/1981.  The old ESOP was still in existence when the profit sharing plan became effective and *it is quite likely* that there was only one administrative committee for both plans and that the current Administrative Committee is the same body or a successor to it.  I doubt that it would be worthwhile to try to research the literal history of the Committee and its members all the way back to the early eighties, unless there are readily accessible minutes for it.  Also, the current Committee is the *logical choice* in any event as it is the body at Franklin that is performing the analogous function today.

**United States District Court**
For the Northern District of California

1    Kessler Decl., Ex. F (e-mail) (emphasis added).

2           Consistent with the above, the Court finds that this e-mail may not be judicially noticed

3    either.  The e-mail does not meet the requirements of Federal Rule of Evidence 201, and further it

4    was not incorporated by reference into the complaint.  However, as above, if the Court does grant

5    Franklin's motion, then it shall consider the e-mail in determining whether Mr. Sender should be

6    allowed to amend.

7           3.     Exhibit E

8           Exhibit E is a document titled "Summary Plan Description" ("SPD") for the Plan.  The SPD

9    notes, *inter alia*, that:

10   •    "Every fiscal year . . . the Board of Directors will determine the amount of the Company

11        contribution," which "may be in Franklin Resources, Inc. Stock or in cash," Kessler Decl.,

12        Ex. E (SPD at 1);

13   •    stock and/or cash will be allocated to each participant under a certain formula, *see* Kessler

14        Decl., Ex. E (SPD at 1);

15   •    "[f]unds to provide benefits under the Plan will be obtained from the Trust fund account,"

16        Kessler Decl., Ex. E (SPD at 5); and

17   •    "[a]ll contributions are paid to the Trustee, who is responsible for safe guarding the Plan

18        assets for the benefit of Plan participants and who distributes the funds as provided in the

19        Plan."  Kessler Decl., Ex. E (SPD at 6).

20          In its motion to strike, Franklin argues that the SPD should not be considered in conjunction

21   with its Rule 12(c) motion because, "[a]lthough the Plan document itself is properly incorporated by

22   reference into Plaintiff's Complaint, the summary plan description does not constitute the terms of

23   the Plan," as the Supreme Court has expressly held.  Docket No. 96 (Mot. at 5); *see also CIGNA*

24   *Corp. v. Amara*, 131 S. Ct. 1866, 1878 (2011) (stating that "we conclude that the summary

25   documents, important as they are, provide communication with beneficiaries *about* the plan, but that

26   their statements do not themselves constitute the *terms* of the plan for purposes of §

27   [1132](a)(1)(B)") (emphasis in original).  Furthermore, the SPD states on its face that, "[i]n the

28

1    event of any conflict between this pamphlet and the legal documents, the provisions of the Plan and

2    Trust Documents will govern."  Kessler Decl., Ex. E (SPD at 6).

3          At the end of the day, the motion is largely moot because Mr. Sender does not really rely on

4    the SPD in his opposition to Franklin's motion.  The one place where Mr. Sender does place some

5    reliance on the SPD is in footnote 9 of his opposition where, he argues the SPD "is explicit that a

6    claim lies against Franklin for unpaid benefits under the Plan," Opp'n at 16 n.9 – presumably

7    because the SPD states that "[b]enefits under the Plan are enforceable by law and litigation [may] be

8    used *against the Company* for enforcement of your claim."  Kessler Decl., Ex. E (SPD at 5)

9    (emphasis added).  But even here Mr. Sender concedes that the Plan is ultimately controlling.  *See*

10   Opp'n at 16 n.9 (adding that the SPD "is entirely consistent with the governing Plan documents and

11   provides *further* confirmation that Franklin is a proper party hereto") (emphasis added).

12   Accordingly, the motion to strike the SPD is denied as moot.

13   D.     *Cyr*

14         As noted above, the sole claim brought by Mr. Sender is one pursuant to § 1132(a)(1)(B),

15   which provides that "[a] civil action may be brought . . . by a participant or beneficiary . . . to

16   recover benefits due to him under the terms of his plan [or] to enforce his rights under the terms of

17   the plan."  29 U.S.C § 1132(a)(1)(B).  Mr. Sender has decided not to bring any other ERISA claim,

18   including a claim for breach of fiduciary duty.  He only sues to obtain the benefit due under the Plan

19   – shares of Franklin stock.  In its motion for judgment on the pleadings, Franklin argues that it is not

20   a proper defendant with respect to Mr. Sender's § 1132(a)(1)(B) claim.  Typically the proper

21   defendant in such a suit is the plan and/or plan administrator, not the employer.  *See, e.g., Vaughn*,

22   567 F.3d at 1028 (9th Cir. 2009) (noting that, "whereas claims under ERISA § [1132](a)(2) can be

23   brought against any fiduciary, 'the defendant [in an action brought under § [1132](a)(1)(B)] is the

24   plan itself (or plan administrators in their official capacities only)'").

25         As both parties recognize, the issue of who is a proper defendant for a § 1132(a)(1)(B) claim

26   was most recently addressed by the Ninth Circuit in *Cyr v. Reliance Standard Life Insurance Co.*,

27   642 F.3d 1202 (9th Cir. 2011).  The specific issue before the court was whether parties other than

28   the plan or plan administrator could be sued.  The Ninth Circuit began by noting that, "[b]y its terms,

§ 1132(a)(1)(B) does not appear to limit which parties may be proper defendants in that civil action." *Id.* at 1205.  The court then pointed out that the Supreme Court had read no limitations as to who could be sued under a similar ERISA provision, *see* 29 U.S.C. § 1132(a)(3) (providing that "[a] civil action may be brought – . . . by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan"), and therefore no prescribed limitations should be read into § 1132(a)(1)(B).  *See Cyr*, 642 F.3d at 1206.

Notably, the Ninth Circuit also took into account that, under another provision in ERISA, "[a]ny money judgment under this title against an employee benefit plan shall be enforceable only against the plan as an entity and shall not be enforceable against any other person *unless* liability against such person is established in his individual capacity under this title."  29 U.S.C. § 1132(d)(2) (emphasis added).  This provision, the court explained, provided support to its conclusion that parties other than the plan or plan administrator could be potential defendants: "The 'unless' clause necessarily indicates that parties other than plans can be sued for money damages under other provisions of ERISA, such as § 1132(a)(1)(B), as long as that party's individual liability is established."  *Id.* at 1207.

In *Cyr* itself, the plaintiff had brought suit against not only the plan and plan administrator (CTI) but also the insurer of the plan (Reliance).  The Ninth Circuit rejected the insurer's argument that it could not be held liable, explaining that

> [a] plan administrator can be an entity that has no authority to resolve benefit claims or any responsibility to pay them.  In this case, for example, CTI was identified as the plan administrator, but it had nothing to do with denying [plaintiff's] claim for increased benefits. Reliance [the insurer] denied [plaintiff's] request for increased benefits even though, as the plan insurer, it was responsible for paying legitimate benefits claims.  Reliance is, therefore, *a logical defendant* for an action by [the plaintiff] to recover benefits due to her under the terms of the plan and to enforce her rights under the terms of the plan, which is precisely the civil action authorized by § 1132(a)(1)(B).

*Id.* at 1207 (emphasis added).

16

**United States District Court**
For the Northern District of California

Thus, under *Cyr*, the question for a court is who is a logical defendant for a claim brought pursuant to § 1132(a)(1)(B). In determining who is a logical defendant, a court considers who has authority to resolve benefit claims or who has responsibility to pay them. *See id.*

1.      Authority to Resolve Benefit Claims

Although Mr. Sender claims that Franklin had the authority to resolve benefit claims, that is not supported by the Plan document. The Plan document on its face states that the entity to administer the Plan is the Plan Committee – not Franklin.[5] *See* Kessler Decl., Ex. B (Plan ¶¶ 8.01, 8.03) (providing that "[t]he Plan shall be administered by the Plan Committee," and that "[t]he Plan Committee shall have power and authority: (1) To perform all acts and do all things necessary to carry out this Plan and the intent and purposes thereof").

In his papers, Mr. Sender claims that the Plan Committee is really just an internal committee within Franklin, *see* Opp'n at 15 (asserting that "[t]his is a committee within Franklin like any other management committee"), but there are no allegations in the SAC to this effect. Indeed, the Plan Committee may simply have been a committee within the Plan itself – a legally distinct entity from Franklin, *see* 29 U.S.C. § 1132(d)(1) (noting that a "plan may sue or be sued under this title as an entity"); *see also Washington-Baltimore Newspaper Guild Local 35 v. Washington Star Co.*, 543 F. Supp. 906, 910 (D.D.C. 1982) (in case evaluating a claim of privilege, noting that ERISA "established, in clear and unmistakable terms, that a pension fund is an independent entity, separate from the employer" and that, "despite an employer's close involvement with and funding of the Plan, it nevertheless exists as a fully separate legal entity") – not a committee of Franklin.

Mr. Sender suggests that the Plan Committee was an internal committee within Franklin because the Plan Committee members were appointed by Franklin's board of directors and at least one of the members had to be a Franklin officer. Furthermore, Franklin was required to "indemnify

---

[5] Because the Plan document on its face identifies a plan administrator, Mr. Sender's argument that Franklin – as the plan sponsor – should be deemed the "default" plan administrator is without merit. *See* Opp'n at 15 (citing 29 U.S.C. § 1002(16)(A), which provides that "[t]he term 'administrator' means – (i) the person specifically so designated by the terms of the instrument under which the plan is operated; (ii) *if an administrator is not so designated*, the plan sponsor; or (iii) in the case of a plan for which an administrator is not designated and a plan sponsor cannot be identified, such other person as the Secretary may by regulation prescribe") (emphasis added).

United States District Court

For the Northern District of California

1  and hold harmless each member of the Plan Committee . . . arising from any act or omission of such

2  member, except when the same is judicially determined to be due to the gross negligence or willful

3  misconduct of such member." *See* Kessler Decl., Ex. B (Plan ¶¶ 8.01, 8.08). Nonetheless, these

4  provisions do not establish a plausible claim that the Plan Committee was an internal committee

5  within Franklin.[6] *See Bell Atl. v. Twombly*, 550 U.S. 544, 557 (2007) (stating that there is a "need at

6  the pleading stage for allegations plausibly suggesting (*not merely consistent with*) agreement [*i.e.*,

7  conspiracy]") (emphasis added).

8      Of course, even if Mr. Sender could make a plausible showing that Franklin was the plan

9  administrator (*i.e.*, because the Plan Committee was just an internal committee within the company)

10  or otherwise had the authority to resolve benefit claims, there is a bigger obstacle before him. Even

11  if Franklin were the decisionmaker for the Plan, it does not necessarily follow that it should have to

12  pay benefits *out of its own pocket* simply because of this decisionmaking authority. As the Seventh

13  Circuit has noted, "[t]he proper defendant in a suit for benefits under an ERISA plan is . . . normally

14  the plan itself, rather than the plan administrator, because the plan is the obligor[;] [t]o sue the

15  administrator for benefits is like suing a corporation's CEO to collect a corporate debt." *Feinberg v.*

16  *RM Acquisition, LLC*, 629 F.3d 671, 673 (7th Cir. 2011) (noting that "[t]he proper defendant in a

17  suit for benefits under an ERISA plan is . . . normally the plan itself, rather than the plan

18  administrator, because the plan is the obligor[;] [t]o sue the administrator for benefits is like suing a

19  corporation's CEO to collect a corporate debt").

20      The Seventh Circuit's statement is consistent with Ninth Circuit law. As noted above, in

21  *Cyr*, the Ninth Circuit stated that "parties other than plans can be sued for money damages under . . .

22  § 1132(a)(1)(B), as long as that party's *individual liability* is established." *Cyr*, 642 F.3d at 1207

23  (emphasis added). And prior to *Cyr*, the Ninth Circuit has noted that a § 1132(a)(1)(B) claim is

24

25  ───────────────

26      [6] To the extent Mr. Sender suggests that the Huss e-mail (Exhibit F attached to the Kessler declaration, which Franklin argues should be stricken) lends support to his position because it states
27  that "the current [Plan] Committee is the logical choice [to decide Mr. Sender's] claim as it is the body *at Franklin* that is performing the analogous function today." Kessler Decl., Ex. F (e-mail)
28  (emphasis added), that argument has little merit. First, the e-mail speaks as to the plan administrator for the plan that *succeeded* the Plan at issue; second, the e-mail is simply a statement made by outside counsel.

1    generally brought against a plan or plan administrator acting in its *official* capacity.  *See Vaughn*567

2    F.3d at 1028 (noting that, "whereas claims under ERISA § [1132](a)(2) can be brought against any

3    fiduciary, 'the defendant [in an action brought under § [1132](a)(1)(B)] is the plan itself (or plan

4    administrators in their official capacities only)'"); *see also Evans v. Akers*, 534 F.3d 65, 72 (1st Cir.

5    2008) (stating that, "[w]hereas a suit 'to recover benefits' under § 502(a)(1)(B) is brought against

6    the plan itself (or the plan administrators in their official capacities), a suit brought under § 502(a)(2)

7    seeks to hold the plan's fiduciaries liable in their personal capacities for breaches of their duty to the

8    plan"); *Graden v. Conexant Sys. Inc.*, 496 F.3d 291, 301 (3d Cir. 2007) (stating that, "[i]n a §

9    1132(a)(1)(B) claim, the defendant is the plan itself (or plan administrators in their official

10   capacities only)").  Here, Mr. Sender does not assert a claim of individual liability for, *e.g.*, breach

11   of fiduciary duty.  Rather, as noted above, he is only suing to collect benefits allegedly owed.  Thus,

12   even assuming that Franklin was the decisionmaker for the Plan, that would simply mean (as

13   Franklin argues) that, at best, it would be ordered to make a benefits decision favorable to Mr.

14   Sender, should he prevail on the merits.  Thus, ultimately, the question comes down to *who* has the

15   responsibility to actually pay benefits.  As discussed below, Mr. Sender has failed to establish in the

16   SAC that Franklin *qua* employer has that responsibility.

17          2.      Responsibility to Pay Benefit Claims

18          Although Mr. Sender argues to the contrary, the person or entity responsible to pay benefit

19   claims was the Plan/Trust.  The fact that Franklin was obligated, as the employer, to make

20   contributions to the Plan/Trust, *see* Kessler Decl., Ex. B (Plan ¶¶ 3.01-.02) (providing that Franklin

21   shall make a contribution each year and that "[t]he Employer's contribution for each year shall be

22   paid to the Trustee"), does not gainsay the fact that the contributions were then held by the

23   Plan/Trust.  Both the Plan and Trust documents make this clear.  *See* Kessler Decl., Ex. B (Plan ¶

24   4.04) (providing that, "[o]n each Anniversary Date the Employer's annual contribution . . . shall be

25   allocated to the Participants' Investment Accounts and Stock Accounts as follows . . . ."); Kessler

26   Decl., Ex. D (Trust Agreement ¶ 1.01) (providing that "Employer contributions shall be paid to the

27   Trustee from time to time in accordance with the Plan" and that "[a]ll Employer contributions

28   hereafter made . . .  shall be held by the Trustee in trust hereunder as the Trust assets").  *Compare*

United States District Court

For the Northern District of California

*Leister v. Dovetail, Inc.*, 546 F.3d 875, 879 (7th Cir. 2008) (noting that "benefits are an obligation of the plan, so the plan is the logical and normally the only proper defendant[,] [b]ut in cases such as this, *in which the plan has never been unambiguously identified as a distinct entity*, we have permitted the plaintiff to name as defendant whatever entity or entities, individual or corporate, control the plan") (emphasis added).

To the extent Mr. Sender argues that the SPD (Exhibit E to the Kessler declaration, which Franklin argues should be stricken) establishes that "a claim lies against Franklin for unpaid benefits under the Plan," Opp'n at 16 n.9, that argument is without merit. Although the SPD states that "[b]enefits under the Plan are enforceable by law and litigation [may] be used *against the Company* for enforcement of your claim." Kessler Decl., Ex. E (SPD at 5) (emphasis added), the document also states that "[f]unds to provide benefits under the Plan will be obtained from the Trust fund account." Kessler Decl., Ex. E (SPD at 5). Furthermore, the SPD states on its face that, "[i]n the event of any conflict between this pamphlet and the legal documents, the provisions of the Plan and Trust Documents will govern." Kessler Decl., Ex. E (SPD at 6). As noted above, the Plan and Trust documents both indicate that contributions are made by Franklin to the Plan/Trust and that the Plan/Trust then holds those contributions on behalf of the beneficiaries.

Given the fact that the Plan/Trust takes control of the contributions from Franklin, the only person or entity who could be commanded to give up the contributions to Mr. Sender in the instant case (should he prevail) is the Plan/Trust. Arguably, if Franklin had failed to make contributions to the Plan/Trust as required by the Plan and Trust documents, then Mr. Sender should be entitled to get a remedy from Franklin. But as Franklin points out and as noted above, at a hearing before this Court, Mr. Sender specifically conceded that Franklin had made the necessary contributions to the Plan/Trust; it was simply the failure of the Plan/Trust to then deliver the contributions to him.

> Court:        . . . . [Y]ou're not alleging that there's a failure of Franklin to put the stock into the Plan. It was the failure of the Plan to then distribute the stock to Mr. Sender.
>
> Counsel:      *Technically that would be correct, your Honor.* But frankly, I think this sort of all amounts to somewhat of a shell game in terms of these entities. . . .

United States District Court

For the Northern District of California

Docket No. 75 (Perkins Decl., Ex. B) (Tr. at 6) (emphasis added).  Mr. Sender also effectively made this concession in his SAC.  *See* SAC ¶ 18 (quoting from Mr. Sender's appeal of the Administrative Committee decision as follows: "'[Sender] does not dispute that the Company created a Certificate reflecting his share balance nor that his name[] appeared on the Company's List of Registered Shareholders'").  Because Mr. Sender's allegations comes down to a claim that the Plan/Trust did not deliver the stock to him, Mr. Sender must look to the Plan/Trust for relief, and not Franklin.

To the extent an argument could be made that, even if Mr. Sender were obligated to look to the Plan/Trust for relief, the Plan/Trust is really just an alter ego for Franklin, Mr. Sender has not made any specific allegations to support this theory in his SAC.[7]  More important, at the hearing, Mr. Sender explicitly disavowed reliance on an alter ego or "piercing the veil" theory.  Mr. Sender expressly argued that he did not need to rely on such a theory because the Plan Committee was just an internal committee within Franklin.  He proffered no basis for asserting alter ego.

Finally, to the extent Mr. Sender argues that Franklin should be held liable because he otherwise would be deprived of a remedy for a wrong, that argument is unpersuasive.  As Franklin points out, ERISA does not always provide a remedy for a wrong.  *See, e.g.*, *Peralta v. Hispanic Business, Inc.*, 419 F.3d 1064, 1073 (9th Cir. 2005) (in case where plaintiff sued her employer, also the plan administrator, for a *breach of fiduciary duty* under ERISA (*i.e.*, § 1132(a)(2)), noting that, "[i]n this case, there is no possibility that [plaintiff] can recover any benefits under the now-defunct plan pursuant to *§ 1132(a)(1)(B)*") (emphasis added); *see also Evans*, 534 F.3d at 72-73 (taking note that a plan may be liable under § 1132(a)(1)(B) but nevertheless may still be judgment proof – *e.g.*, because "ERISA's fiduciary obligations prevent plans from paying judgments out of funds allocable to other participants"; thus noting that, "for most plaintiffs the sensible route is to use § 1132(a)(2)

---

[7] Presumably, an alter-ego theory may be made even under ERISA law.  *See Carter v. Health Net of Cal., Inc.*, 374 F.3d 830, 839 (9th Cir. 2004) (rejecting party's complaint that arbitrator improperly favored California law over federal law on alter ego determinations because "'it is well settled that where ERISA is silent on an issue, we may turn to state law to fashion the appropriate federal common-law rule'"); *Seide v. Crest Color*, 835 F. Supp. 732, 736-37 (S.D.N.Y. 1993) (stating that "federal law 'gives less deference to the corporate form than does the strict *alter ego* doctrine of state law, and that 'courts have without difficulty disregarded form for substance where ERISA's effectiveness would otherwise be undermined'").  However, none was made here.

[*i.e.*, breach of fiduciary duty] to get the money in the first instance from a solvent party liable to make good on the loss, not from the plan itself").

    3.    Immaterial Arguments

Based on the above, the Court grants Franklin's motion for judgment on the pleadings. Even if Franklin were the plan administrator or otherwise had the authority to resolve benefit claims, that decisionmaking authority alone does mean that it should be obligated to pay benefits out of its own pocket, assuming that Mr. Sender will prevail on the merits. The Plan and Trust documents show that the real party who would be obligated to give stock or otherwise make payments to Mr. Sender (should he prevail) is the Plan/Trust itself, which is now defunct.

The remaining arguments made by Mr. Sender in his opposition brief do not alter this conclusion. For example, the fact that the current plan's Administrative Committee accepted Mr. Sender's claim in 2007 and then denied it[8] does not mean that Franklin should be obligated to pay. Even if that Administrative Committee is an internal committee within Franklin, that does not mean that Franklin was *legally* responsible to pay benefits owed by the Plan. As for Mr. Sender's contention that Franklin admitted liability in its answer or waived its right to assert the defense that it is not the proper defendant, that argument is entirely without merit. In its answer,[9] Franklin asserted a number of affirmative defenses, including failure to state a claim, "[t]he relief Sender seeks against Franklin is not available under ERISA," and "Sender's remedies are limited to those provided by ERISA." Docket No. 34 (first, ninth, and tenth affirmative defenses).

---

[8] Franklin fairly points out that the current plan Administrative Committee might well have taken up Mr. Sender's claim simply so that it could not be charged with a violation of ERISA for not reviewing the claim. *See* Reply at 11. Even if the Administrative Committee had found Mr. Sender correct in that he did not receive the benefit (stock) owed under the Plan, that would not have empowered the Committee to remedy the situation, given the nonexistence of the Plan and the absence of any claim of breach of fiduciary duty.

[9] This appears to have been the first answer that Franklin made in the action, whether in state or federal court. At the very least, this was the first answer that Franklin made to an *ERISA* claim, as asserted by Mr. Sender.

**United States District Court**
For the Northern District of California

E.      Amendment

As the Court is granting Franklin's motion, the only remaining question is whether it should permit Mr. Sender to amend his complaint. Based on the evidence of record, any amendment would be futile. As noted above, even if Franklin was the plan administrator (by virtue of the Plan Committee being an internal committee within the company) or otherwise had the authority to resolve benefit claims, the bottom line is that the person or entity who should pay out is the Plan/Trust, and not Franklin. The exhibits attached to the Kessler declaration, including the Smith e-mail and the Huss e-mail, at most reflect Franklin's concern that it could be held liable. They do not change the fact that the Plan/Trust no longer exists. Because amendment would be futile, the Court grants Franklin's motion for judgment on the pleadings and dismisses Mr. Sender's claim with prejudice.

## III.      MOTION FOR SUMMARY JUDGMENT

Because the Court is granting Franklin's motion for judgment on the pleadings, it need not address Franklin's motion for summary judgment. Nevertheless, the Court has decided to address the motion as it provides an independent ground for dismissal. In the motion, Franklin argues that it is entitled to summary judgment because there is no genuine dispute of material fact that Mr. Sender's ERISA claim is barred by the statute of limitations and/or laches.

A.      Factual & Procedural Background

In his sole claim for benefits under ERISA, *see* 29 U.S.C. § 1132(a)(1)(B), Mr. Sender maintains that he never received stock to which he was entitled under the then-existing ESOP.

The parties do not appear to dispute that Mr. Sender was an employee of Franklin and that he worked for Franklin (1) from approximately June 1972 to January 1978 and (2) from approximately 1983 to 1989. *See* SAC ¶ 10; Ans. ¶ 10. The parties also do not appear to dispute that there was an ESOP in existence during Mr. Sender's first stint of employment with Franklin, which was established in 1975 and which terminated in 1983, albeit retroactively effective as of 1981. *See* SAC ¶¶ 11-12; Ans. ¶¶ 11-12; Smith Decl., Exs. —N (memo from Franklin to employees, dated 1983, and 1983 tax form). Finally, the parties do not appear to dispute that Mr. Sender was entitled to stock through the ESOP and that the stock to which he was entitled (at or about the time the Plan

**United States District Court**

For the Northern District of California

1   was terminated) constituted 1,450 shares.  *See* Smith Decl., Ex. A (stock certificate); SAC ¶ 18

2   (quoting from May 2008 appeal to Administrative Committee as follows: "'[Sender] does not

3   dispute that the Company created a Certificate reflecting his share balance nor that his name[]

4   appeared on the Company's List of Registered Shareholders'").  What is in dispute is whether Mr.

5   Sender was actually given those shares.  Mr. Sender maintains that the stock certificate was never

6   actually given to him; Franklin asserts to the contrary.

7          For purposes of the motion for summary judgment, the Court assumes that Mr. Sender never

8   actually got the stock certificate.  Franklin argues that, nevertheless, it should still be entitled to

9   summary judgment because Mr. Sender should have brought his claim for the stock certificate far

10  earlier.  According to Franklin, to comply with the statute of limitations, Mr. Sender should have

11  filed suit, at the latest, by 1988 because he knew – or at least should have known – back in the 1982-

12  84 time period that he was entitled to the stock under the Plan but that the stock had not been

13  delivered to him.[10]  Franklin points to evidence reflecting that, during the 1982-84 time period, Mr.

14  Sender had received benefits from the stock that should have made clear to him his entitlement to

15  the stock.  In particular, Mr. Sender voted proxy cards for 1,470 shares of stock (1,450 shares from

16  the ESOP and 20 shares that Mr. Sender already owned) and further received dividends for the 1,470

17  shares of stock, as reported on his tax returns.  In addition to the statute of limitations, Franklin

18  contends that the doctrine of laches is an independent bar to Mr. Sender's claim for relief.

19         In opposition, Mr. Sender claims that, during his first period of employment with Franklin,

20  he was never even aware that the ESOP existed and that, at best, there was only a "short comment"

21  made to him in passing (by Phil Scatena of Franklin) when he left in 1978 that he "may be entitled to

22  a retirement benefit from a retirement plan" but that "such benefit would not be available to [him]

23

24

25  _____

26         [10] The parties agree that there is a four-year statute of limitations for Mr. Sender's ERISA
    claim.  *See* Mot. at 12 (noting that, because ERISA does not contain a statute-of-limitations

27  provision, courts look to analogous state law and, under California law, there is a four-year statute of
    limitations for claims of breach of a written contract); Opp'n at 14 (agreeing); *Withrow v. Bache*

28  *Halsey Stuart Shield, Inc.*, 655 F.3d 1032, 1036 (9th Cir. 2011) (applying California's four-year
    statute of limitations for contract disputes to an ERISA claim brought pursuant to § 1132(a)(1)(B)).

1    until [he] reached retirement age." Sender Decl. ¶ 5.  Mr. Sender also claims that he was never

2    informed that the Plan was terminated.[11]  *See* Sender Decl. ¶ 3.

3        Mr. Sender discounts Franklin's evidence that he voted proxy cards and received dividends

4    in the 1982-84 period on two grounds: (1) because, during that time, he also owned company stock

5    independent of any ESOP and (2) because, even if he knew or should have known that he was voting

6    on or getting dividends on ESOP stock, that does not mean that he should therefore have sought

7    delivery of the stock because he had those rights even without delivery – *i.e.*, he still had no

8    expectation that the stock itself should be available to him any earlier than retirement.  *See* Docket

9    No. 105 (Opp'n to Mot. to Strike at 5) (arguing that "Plaintiff would have received dividends and

10   proxy cards whether the stock was in the trust account waiting for his retirement decades hence, or if

11   it had been distributed to a share certificate in 1982").

12   B.    Legal Standard

13       Federal Rule of Civil Procedure 56(a) provides a court shall grant summary judgment to the

14   moving party "if the movant shows that there is no genuine dispute as to any material fact and the

15   movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue of fact is genuine

16   only if there is sufficient evidence for a reasonable jury to find for the nonmoving party.  *See*

17   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  "The mere existence of a scintilla of

18   evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for

19   the [nonmoving party]."  *Id.* at 252.  At the summary judgment stage, evidence must be viewed in

20   the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in the

21   nonmovant's favor.  *See id.* at 255.

22       Where the plaintiff has the ultimate burden of proof, the defendant may prevail on a motion

23   for summary judgment simply by pointing to the plaintiff's failure "to make a showing sufficient to

24   establish the existence of an element essential to [the plaintiff's] case."  *Celotex Corp. v. Catrett*,

25   477 U.S. 317, 322 (1986).  However, where a defendant moves for summary judgment based on an

26   affirmative defense for which it has the burden of proof – such as the statute of limitations – the

27

28
        ───────────────────────

         [11] As discussed below, Franklin has moved to strike the Sender declaration.

United States District Court

For the Northern District of California

1  defendant "must establish beyond peradventure all of the essential elements of the . . . defense to

2  warrant judgment in [its] favor." *Martin v. Alamo Cmty. College Dist.*, 353 F.3d 409, 412 (5th Cir.

3  2003) (internal quotation marks and emphasis omitted); *see also Clark v. Capital Credit &*

4  *Collection Servs.*, 460 F.3d 1162, 1177 (9th Cir. 2006) (noting that a defendant bears the burden of

5  proof at summary judgment with respect to an affirmative defense).

6  C.    Franklin's Motion to Strike (Docket No. 98)

7        Before the Court may address the merits of Franklin's motion for summary judgment, it must

8  first resolve Franklin's motion to strike, as that will inform what evidence the Court may consider in

9  conjunction with the summary judgment motion.  In its motion to strike, Franklin argues that the

10 Court should disregard the declaration submitted by Mr. Sender – in its entirety or, at the very least,

11 in part.

12       To the extent Franklin argues that the declaration should be stricken in its entirety, the Court

13 does not agree.  Franklin takes the position that the Court should ignore the Sender declaration

14 because it was not part of the administrative record.  But as the summary judgment motion is not

15 addressing the merits of the administrative decision – as Franklin readily admits, *see* Docket No. 111

16 (Reply ISO Mot. to Strike at 3) (stating that the summary judgment motion "does not involve the

17 merits of Plaintiff's claim for benefits") – and thus the Court may look outside of the administrative

18 record to resolve this motion.

19       In the alternative, Franklin argues that the Sender declaration should be stricken in part: (1)

20 because it contains information that is not relevant for purposes of the summary judgment motion

21 and (2) because it contains "patently false" information.  Docket No. 98 (Mot. to Strike at 7).  As to

22 the first argument, Franklin is technically right.  The Sender declaration contains many statements to

23 the effect that Mr. Sender did not actually receive the stock, but that is a merits issue; for purposes of

24 the summary judgment motion, the Court is assuming that Mr. Sender did not in fact (as he claims)

25 actually get the stock.  Even so, Franklin has not cited to any authority establishing that the Court is

26 required to strike such statements.  Even Federal Rule of Civil Procedure 12(f), which applies to

27 pleadings and not declarations, provides that a "court *may* strike . . . an insufficient defense or any

28 redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f) (emphasis added).

1   The Court does not see any purpose in striking the irrelevant information because there is no

2   prejudice to Franklin.

3          As to the second argument, it does not matter whether or not the Court strikes the allegedly

4   false statement in the Sender declaration.  In his declaration, Mr. Sender stated that he "provided all

5   information in my possession that was requested by Franklin in the course of its administrative

6   review."  Sender Decl. ¶ 10.  Franklin claims the statement was false because Mr. Sender failed, at

7   least during the administrative review, to provide copies of his tax returns for the years 1982 and

8   1984.  Because this statement has no relevance to the merits of the summary judgment motion, the

9   motion to strike is moot.

10  D.     Accrual of Claim

11         As noted above, the parties agree that there is a four-year statute of limitations for Mr.

12  Sender's § 1132(a)(1)(B) claim.  *See* note 1, *supra*.  The parties disagree, however, as to when that

13  claim accrued.

14         Under Ninth Circuit law, "'an ERISA cause of action accrues either at the time benefits are

15  actually denied *or* when the insured has reason to know that the claim has been denied.'"  *Chuck v.*

16  *Hewlett Packard Co.*, 455 F.3d 1026, 1031 (9th Cir. 2006) (emphasis added).  As to the latter prong,

17  the Ninth Circuit has emphasized that

18                  [a] participant *need not file a formal application for benefits* before
                    having "reason to know" that his claim has been finally denied.
19                  Instead, a cause of action accrues when a pension plan communicates
                    "a clear and continuing repudiation" of a claimant's rights under a
20                  plan, such that the claimant could not have reasonably believed but
                    that his benefits had been "finally denied."

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

*Id.* (emphasis added); *see also Withrow*, 655 F.3d at 1036.[12]  "In other words, some 'event other than a denial of a claim' may trigger the statute of limitations by clearly alerting the plaintiff that his entitlement to benefits has been repudiated."  *Miller v. Fortis Benefits Ins. Co.*, 475 F.3d 516, 521 (3d Cir. 2007) (also stating that there may be repudiation other than through a formal denial "when a beneficiary knows or should know he has a cause of action").  Courts have explained that an event other than a denial of a claim should be enough to trigger to the statute of limitations because "[i]t seems obvious" that a plaintiff should not be able to "indefinitely extend the statute of limitations by indefinitely delaying the filing of a claim for benefits."  *Blakely v. Caterpillar, Inc.*, No. 09-CV-1318, 2010 U.S. Dist. LEXIS 51457, at *6 (C.D. Ill. Mar. 8, 2010); *see also Scruggs v. ExxonMobil Pension Plan*, No. CIV-06-0465-F, 2008 U.S. Dist. LEXIS 49597, at *13-14 (W.D. Okla. June 30, 2008) (rejecting plaintiff's argument that there must be a claim for benefits and a denial in order for a claim to accrue because this would mean that "so long as the prospective plaintiff never sought benefits so that her claims were never denied, the limitations period would never begin to run on her benefit claims").

        Mr. Sender argues that, under the above Ninth Circuit standard, his claim did not accrue until December 2008 – when the current plan's Administrative Committee denied his appeal.  In turn,

---

        [12] Other circuit courts have ruled similarly.  For example, in *Romero v. Allstate Corp.*, 404 F.3d 212 (3d Cir. 2003), the Third Circuit noted as follows:

> *Under the general formulation of the discovery rule*, a claim will accrue when the plaintiff discovers, or with due diligence should have discovered, the injury that forms the basis for the claim.  *The rule that has developed in the more specific ERISA context* is that an ERISA non-fiduciary duty claim will accrue after a claim for benefits due under an ERISA plan has been made and formally denied.  Occasionally, however, an ERISA non-fiduciary claim will accrue before a formal application is made and/or before benefits are formally denied, such as "when there has been a repudiation [of the benefits] by the fiduciary which is clear and made known to the beneficiary."  This "clear repudiation" concept is consistent with the federal discovery rule and, in the specific context of ERISA, avoids a myriad of ills that would accompany any rule that required the denial of a formal application for benefits before a claim accrues.

*Id.* at 222-23 (emphasis omitted and added).

Franklin argues that, under this standard, his claim accrued in the 1982-84 period because, during that time, he knew that he was getting stock-related benefits (*i.e.*, the right to vote proxy cards and get dividends) but that he had not actually been delivered the stock itself.  Mr. Sender responds that, under the Plan/Trust, he was entitled to voting rights and dividends without the stock actually being delivered to him (*i.e.*, while the stock remained in the Plan/Trust).  Mr. Sender also argues that, to the extent he was getting voting rights and dividends, he thought that was for the company stock that he owned independent of the ESOP.  Those two issues are addressed below.

E.      Voting and Dividends

For purposes of the summary judgment motion, the Court accepts Mr. Sender's claim that he did not know about any ESOP for his first term of employment with Franklin until a passing reference about one was made when he left employment for the first time – and even then the reference suggested that he would get benefits under the Plan only at retirement.  The Court also accepts Mr. Sender's claim that he did not know, during the relevant period, that the ESOP was actually terminated in the early 1980's.

Accepting that the above constituted Mr. Sender's *actual* knowledge, the Court must then focus on the issue of Mr. Sender's *constructive* knowledge – *i.e.*, should he have known that he was getting benefits prior to retirement, which would put him on notice that he did not have to wait until retirement to obtain the stock.

Franklin takes the position that, when Mr. Sender got the right to vote proxy cards and received dividends or distributions in the 1982-84 period, then he should have known that he was getting benefits and should have had the stock along with those benefits.[13]  In response, Mr. Sender

_____

[13] As noted above, it appears undisputed that the stock certificate that Mr. Sender allegedly should have been given back in the early 1980's from the Plan/Trust constituted 1,450 shares of stock.  *See* Smith Decl., Ex. A (stock certificate, dated 8/4/1982).  It also appears undisputed that Mr. Sender also had 20 shares of company stock independent of the ESOP stock, *see* Smith Decl., Ex. F (Bank of New York document, dated 1/31/1982, reflecting 16 shares in account 00401200-1); Smith Decl., Ex. Z (reflecting stock split which would increase shares from 16 to 20); *see also* Mot. at 7 n.4, for a total of 1,470 shares of stock (back in the early 1980's).  *See* Smith Decl., Ex. G (Bank of New York document, dated 2/14/1983, reflecting 1,470 shares in account 00401200-1).

Franklin has submitted evidence that, at the very least, Mr. Sender exercised his voting rights on the account that held the 1,470 shares of stock in 1983.  *See* Smith Decl., Ex. I (proxy card for account 004012001, dated 2/18/1983).  Franklin has also submitted evidence indicating that Mr.

United States District Court

For the Northern District of California

1   has two arguments: (1) he did not know that the right to vote and dividends/distributions were

2   related to the ESOP stock because he also owned company stock outside of the ESOP, and thus he

3   was not necessarily alerted that he had the benefit of the ESOP shares, *see* Sender Decl. ¶ 14, and (2)

4   even if he should have known that the right to vote and dividends/distributions were related to the

5   ESOP stock, he still had no reason to seek delivery of the stock at that time because he was entitled

6   to those rights even without actual delivery of the stock (*i.e.*, he was entitled to those rights even

7   while the stock remained in the Plan/Trust).

8           1.      <u>Other Company Stock</u>

9           There is no dispute that Mr. Sender did own company stock outside of the ESOP.  But the

10  bulk of this "other" company stock consisted of shares that Mr. Sender purchased from Franklin's

11  former chairman of the Board, Lou Jamison, *see* Sender Decl. ¶ 13, and these "Jamison shares" were

12  not held by Mr. Sender individually – as were the ESOP shares – but rather were held by him and

13  his wife jointly.  The Jamison shares held *jointly* by Mr. Sender and his wife were in a different

14  account from the shares of company stock that he held *individually*.  Mr. Sender separated out

15  dividends on the jointly owned Jamison stock from the dividends on the stock he held individually

16  as reflected in his tax returns which drew a distinction between the two tranches of stock.  *See* Smith

17  Decl., Ex. K (FRI/SEN 000933).  He also received and signed separate and distinct proxy cards for

18  the stock he held as an individual and for the Jamison stock that he jointly owned with his wife.  *See*

19  Smith Decl., Exs. I-J (two different proxy cards for two different accounts, one held by Mr. Sender

20  alone and one held by Mr. Sender and his wife).  These proxies clearly denominated the difference

21  in ownership.  Through his actions, Mr. Sender recognized the distinction between the Jamison stock

22  held with his wife and his other stock owned individually.  *See also* Sender Decl. ¶ 4 (stating that "I

23  consider myself to be a careful recordkeeper").  This negates his claim that he erroneously believed

24  he was getting proxy cards and dividends based only on the Jamison stock.  *See Villiarimo v. Aloha*

25  *Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (noting that "this court has refused to find a

26  'genuine issue' where the only evidence presented is 'uncorroborated and self-serving' testimony");

27

28  ───────────────

Sender received dividends on the 1,470 shares of stock in 1983.  *See* Mot. at 8-9.

1   *Leslie v. Grupo ICA*, 198 F.3d 1152, 1157 (9th Cir. 1999) (indicating that, even on summary

2   judgment, a court need not credit self-serving testimony unsupported by corroborating evidence and

3   undermined by other credible evidence); *see also SEC v. Phan*, 500 F.3d 895, 900 (9th Cir. 2007)

4   (stating that, "[i]n most cases" – but not all – the fact "'[t]hat an affidavit is self-serving bears on its

5   credibility, not on its cognizability for purposes of establishing a genuine issue of material fact'").

6   At the very least, the undisputed facts show Mr. Sender *should* have known that the Jamison stock

7   could not have been the source of the dividends and proxy cards.

8          As to the stock that Mr. Sender held in his individual name, he did own 20 shares outside of

9   the ESOP stock.  But for Mr. Sender to argue that he thought that the dividends he received were

10   attributable to those 20 shares is not sustainable for the reasons explained in Franklin's reply brief.

> In 1982, before the distribution of 1,450 shares of Franklin stock to
> Plaintiff from the ESOP during that year, Plaintiff owned 20 shares of
> Franklin stock.  Following the distribution to Plaintiff of the Franklin
> stock from the ESOP, Plaintiff was paid **73 times** the amount of
> dividends he would have paid on his original 20 shares.  The dividends
> paid in 1983 (and reported by Plaintiff on his tax return for that year)
> were $.10/share in March 1983 and $.06/share in October 1983.
> Therefore, instead of the $2.00 in dividends that Plaintiff would have
> received on his original 20 shares, Plaintiff in March 1983 actually
> received $147.00 in divided payments from Franklin.  Instead of the
> $2.40 in dividends he would have received in October 1983 on his
> original shares, Plaintiff actually received $176.00.  These are not
> insignificant differences, particularly in 1983, when the value of the
> dollar was less than half of what it is today.  It is disingenuous for
> Plaintiff, a self-professed "businessman," and "careful recordkeeper,"
> to claim that he did not pay attention to his receipt of Franklin
> dividend payments and that he did not notice the substantial difference
> in the amount of dividends paid, particularly when he declared them
> on his 1983 income tax returns and paid income tax on them.

21   Reply at 9 (emphasis added; also explaining why Mr. Sender should have known that the dividends

22   were not being paid on his Franklin money market account).  In other words, because Mr. Sender

23   was getting significantly more dividends than could be attributable to the 20 non-ESOP shares, he

24   *should* have known – at the very least – that he was getting dividends on company stock other than

25   the non-ESOP stock that he independently owned.  Of course, one could argue that that does not

26   necessarily mean that Mr. Sender should have known that that company stock came from the ESOP.

27   But Mr. Sender identifies no other source form which he could have expected that stock to come,

28   especially after 1984 when, as Franklin points out, it is clear that Mr. Franklin was getting a

United States District Court

For the Northern District of California

1    distribution from the ESOP specifically. *See* Smith Decl., Ex. O (1984 tax form reflecting

2    distribution of $44.03 to Mr. Sender *from the Plan/Trust*).

3         Indeed, it is significant that Mr. Sender does not dispute getting the 1984 distribution from

4    the Plan/Trust. *Compare* Sender Decl. ¶ 12 (stating that "I wish to be unequivocal that I had never

5    seen or received . . . the documents attached to the Smith Decl. as Exhibits A, B, L, and M," but *not*

6    Exhibit O). At the very least, this distribution put Mr. Sender on notice that he was in fact getting

7    benefits prior to retirement (contrary to what he had been told earlier), and thus the failure of the

8    Plan to give him the stock as part of that distribution should have been seen by Mr. Sender as a clear

9    repudiation.[14]

10         2.    <u>Rights Without Delivery</u>

11         Mr. Sender, of course, claims that, even if he knew that the voting rights and

12    dividends/distributions came from the ESOP stock, he still had no reason to pursue delivery of the

13    stock certificate because these were rights that he was entitled to even *without* actual delivery of the

14    stock to him (*i.e.*, while the stock remained in the Plan/Trust). In support of this claim, Mr. Sender

15    cites to ¶ 6.05 of the Plan document, which provides as follows: "So long as the Trustee is holding

16    funds for the benefit of any Employee, such Employee, will share proportionately in the net income

17    or losses of the Trust, including unrealized appreciation and depreciation of Employer Stock held in

18    his Stock Account." Smith Decl., Ex. P (Plan ¶ 6.05). While this provision could potentially – in

19    isolation – be read as Mr. Sender contends, other provisions in the Trust Agreement make clear that

20    Mr. Sender's reading is without merit:

21    •    "All Employer contributions . . . shall be held by the Trustee in Trust hereunder as the *Trust*

22       *assets*." Smith Decl., Ex. Q (Trust Agreement ¶ 1.01) (emphasis added).

23    •    "Unless otherwise directed by the Company or the Plan Committee, the Trustee shall hold,

24       invest and administer the Trust assets *as a single fund without identification of any part of*

25       *the Trust assets with or allocation of any part of the Trust assets to the Company or to any*

26

27    ————————————————

28        [14] Even if that repudiation was not immediately apparent to Mr. Sender, it should have become obvious at some point over the following 23 years prior to 2007.

United States District Court

For the Northern District of California

*Participant or group of Participants of the Company or their Beneficiaries*."  Smith Decl., Ex. Q (Trust Agreement ¶ 1.02) (emphasis added).

- "As directed by the Plan Committee, the Trustee shall have the authority and power to: . . . (j) exercise any of the *powers of an owner*, with respect to such Employer Stock and other securities or other property comprising the Trust assets."  Smith Decl., Ex. Q (Trust Agreement, Art. III(j)) (emphasis added).

- "The Trustee shall vote all Employer Stock held by it as part of the Trust assets at such time and in such manner as the Plan Committee shall direct . . . ."  Smith Decl., Ex. Q (Trust Agreement, Art. IV).

As Franklin argues, the above provisions indicate that, if the stock had not actually been delivered to Mr. Sender, then he would not have any voting rights and dividends; rather, those benefits would have remained with the Trust/Trustee.

To the extent Mr. Sender might argue that he did not know of the Plan or Trust terms, he does not specifically state in his declaration that he never saw the Plan or Trust documents during the relevant period.  *Compare* Sender Decl. ¶ 12 (stating that "I wish to be unequivocal that I had never seen or received . . . the documents attached to the Smith Decl. as Exhibits A, B, L, and M," but *not* Exhibits P and Q which are the Plan and Trust documents).  In any event, even if Mr. Sender had never seen the Plan or Trust documents, Mr. Sender has articulated no basis that would justify his claimed belief that he could get the right to vote and dividends/distributions without actually getting the stock itself.[15]  *See Villiarimo*, 281 F.3d at 1061 (noting that "this court has refused to find a 'genuine issue' where the only evidence presented is 'uncorroborated and self-serving' testimony"); *Leslie*, 198 F.3d at 1157 (indicating that, even on summary judgment, a court need not credit self-serving testimony unsupported by corroborating evidence and undermined by other credible evidence).  Furthermore, the test for accrual of the claim here is not what Mr. Sender knew, but what he should have known.

---

[15] The Court also questions the plausibility of the claimed belief given that, at the time he worked for Franklin in the early 1980s, Mr. Sender appears to have been a vice president of sales and further had been a businessman for more than 15 years.  *See* Sender Decl. ¶ 4 (in declaration from December 2012, stating that "I have been a businessman for more than 49 years").

1   Accordingly, the Court agrees with Franklin that – based in particular on the dividends and

2   the 1984 distribution from the Plan/Trust – Mr. Sender should have known, as of the 1982-84

3   period, that he was getting benefits based on the ESOP stock prior to retirement (contrary to what he

4   had been told by Mr. Scatena), in which case the failure of the Plan/Trust to give that stock to Mr.

5   Sender constituted a clear repudiation, if not in 1984, then at some point over the next 23 years.

6   This conclusion is underscored by the fact that it is undisputed that Mr. Sender is a sophisticated

7   businessman who had the title (as confirmed at the hearing) of vice president of sales at Franklin.

8   Mr. Sender's claim accrued if not in 1984, then certainly sometime before 2007, and is therefore

9   time barred.

10  F.    Laches

11  Not only is Mr. Sender's claim for relief barred by the statute of limitations but it is also

12  barred by the doctrine of laches.  "'Laches is an equitable time limitation on a party's right to bring

13  suit,' resting on the maxim that 'one who seeks the help of a court of equity must not sleep on his

14  rights.'"  *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 835 (9th Cir. 2002).  As

15  Franklin argues, laches is a distinct defense from the statute of limitations, *see id.*, and "laches may

16  apply whether or not any statutory limitations period runs," *Jackson v. Axton*, 25 F.3d 884, 888 (9th

17  Cir. 1994) – although, "[i]f the plaintiff filed suit within the . . . limitations period, the strong

18  presumption is that laches is inapplicable." *Jarrow*, 304 F.3d at 835.

19  "To prove laches, the 'defendant must prove both an unreasonable delay by the plaintiff and

20  prejudice to itself.'" *Evergreen Safety Council v. RSA Network, Inc.*, 697 F.3d 1221, 1226 (9th Cir.

21  2012).  "When evaluating the reasonableness of a delay, the evaluation period begins when the

22  plaintiff knew (or should have known) of the [potential cause of action], and ends with the initiation

23  of the lawsuit in which the defendant seeks to invoke the laches defense." *Id.*; *see also Internet*

24  *Specialties West, Inc. v. Milon-Digiorgio Enters.*, 559 F.3d 985, 990 (9th Cir. 2009) (stating that

25  "[t]he limitations period for laches starts when the plaintiff 'knew or should have known about its

26  potential cause of action'"); *Trustees of the S. Cal. Bakery Drivers Sec. Fund v. Middleton*, 366 Fed.

27  Appx. 810, 813 (9th Cir. 2010) (in ERISA case, stating that, for laches defense, defendant "must

28

34

United States District Court

For the Northern District of California

1    show (1) inexcusable delay in Bakery Drivers' assertion of a known right; and (2) prejudice to

2    [defendant]").

3           As to unreasonable delay, the Court's analysis above on the statute of limitations is largely

4    applicable here.  That is, Mr. Sender should have known as of the 1982-84 period that the Plan had

5    repudiated his right to the stock because he was getting the right to vote and dividends/distributions

6    without actually having possession of the stock.  Even if there was not a clear repudiation in the

7    1982-84 period, at some point well before 2007 (*i.e.*, four years before the filing of the complaint in

8    2011), the Plan's failure to deliver the stock should have been seen as a repudiation.  In this respect,

9    it is notable that Mr. Sender admits that he was told in 1978 (even if only in passing) that he might

10   get benefits from the ESOP at the time of his retirement.  With this knowledge, Mr. Sender could

11   easily have asked to see the terms of the Plan, in which case he would have seen that distributions

12   under the Plan were available upon an individual reaching 55 years of age.  *See* SAC ¶ 11 (alleging

13   that, "[w]hen [Mr.] Sender left his employment with Franklin in 1978, the ESOP did not permit

14   immediate distributions to participants younger than 55 years old").  Mr. Sender turned 55 in or

15   about 1997, *see* Sender Decl. ¶ 5 (stating that, "in 1978 I was 36 years old"), which was well before

16   2007 (*i.e.*, four years before the filing of the complaint in 2011).

17          As for the matter of prejudice, it is clear that Franklin has suffered prejudice as a result of

18   Mr. Sender's unreasonable delay.  The Ninth Circuit has noted that one form of prejudice in the

19   laches context is evidentiary prejudice.  "Evidentiary prejudice includes such things as lost, stale, or

20   degraded evidence, or witnesses whose memories have faded or who have died."  *See Danjaq LLC

21   v. Sony Corp.*, 263 F.3d 942, 955-56 (9th Cir. 2001) (adding that there is also expectations-based

22   prejudice – *i.e.*, where a defendant "took actions or suffered consequences that it would not have,

23   had the plaintiff brought suit promptly" – and even economic prejudice – *e.g.*, where the plaintiff

24   seeks to profit from a financial risk that the defendant took).  As Franklin notes,

25               many of the records relating to [Mr.] Sender's claim no longer exist.
             All of the ESOP's service providers have destroyed their records
26           under their normal document retention policies. . . . Even the DOL and
             the IRS destroyed all records relating to the ESOP under existing
27           document retention policies.

28

35

United States District Court

For the Northern District of California

1   Mot. at 17.  Furthermore, "many of the employees of Franklin who had been involved in the

2   administration of the ESOP in the early 1980s either no longer work for Franklin or are no longer

3   alive," and Franklin's own records "are not as complete as they could [have been if Mr. Sender]

4   brought his claim within a reasonable period of time," particularly because ERISA "only requires an

5   employer to keep records for a period of six years after filing the required government reports for an

6   ERISA plan, the last of which for the Franklin ESOP was filed in 1985."  Mot. at 18 (citing 29

7   U.S.C. § 1027[16]).  Mr. Sender does not dispute these facts.

8          Accordingly, laches is an independent ground justifying summary judgment in favor of

9   Franklin.

10                              **IV.    CONCLUSION**

11         Based on the foregoing, the Court rules as follows.

12         (1)     Mr. Sender's motion to remand is denied.  The Court has subject matter jurisdiction

13   over the instant case because at least two of the claims pled in the complaint at the time of removal

14   were preempted by ERISA.

15         (2)     Franklin's motion for judgment on the pleadings is granted.  Even if Franklin were

16   the plan administrator or otherwise had the authority to resolve benefit claims, that decisionmaking

17   authority alone does mean that it should be obligated to pay benefits out of its own pocket, should

18   Mr. Sender prevail on the merits.  The Plan and Trust documents show that the real party who would

19   be obligated to give stock or otherwise make payments to Mr. Sender (should he prevail) is the

20

21   _____

22         [16] Section 1027 provides:

23                Every person subject to a requirement to file any report or to certify
                   any information therefor under this title . . . shall maintain records on
24                the matters of which disclosure is required which will provide in
                   sufficient detail the necessary basic information and data from which
25                the documents thus required may be verified, explained, or clarified,
                   and checked for accuracy and completeness, and shall include
26                vouchers, worksheets, receipts, and applicable resolutions, and shall
                   keep such records available for examination for a period of not less
27                than six years after the filing date of the documents based on the
                   information which they contain . . . .

28   29 U.S.C. § 1027.

United States District Court

For the Northern District of California

Plan/Trust itself, which is now defunct.  Because amendment of the complaint would be futile, the Court dismisses Mr. Sender's ERISA claim with prejudice.

(3)      Franklin's motion for summary judgment is granted.  There is no genuine dispute of material fact that Mr. Sender's claim for relief is time barred, pursuant to both the statute of limitations and the doctrine of laches.  This case presents a paradigm example of why there is a statute of limitations and the doctrine of laches.

The Clerk of the Court is instructed to enter judgment in accordance with the above and close the file in this case.

This order disposes of Docket Nos. 74, 77, and 113.


IT IS SO ORDERED.


Dated:  March 14, 2013

_____
EDWARD M. CHEN
United States District Judge